1  **WO**

2

3

4

5

6                    IN THE UNITED STATES DISTRICT COURT

7                        FOR THE DISTRICT OF ARIZONA

8

9  Centro Familiar Cristiano Buenas Nuevas;)   No. CV-08-996-PHX-NVW
   and Jorge Orozco, Pastor,                )
10                                           )   **FINDINGS OF FACT,**
                    Plaintiffs,             )   **CONCLUSIONS OF LAW,**
11                                           )   **and**
   vs.                                       )   **ORDER**
12                                           )
                                            )
13  City of Yuma,                            )
                                            )
14                    Defendant.             )
                                            )
15  _____)

16

17          Plaintiff Centro Familiar Cristiano Buenas Nuevas ("the Church") purchased a

18  property at 354 S. Main St. in downtown Yuma, Arizona intending to use the facility as a

    church.  The City's Planning and Zoning Commission denied the Church a conditional
19
    use permit ("CUP"), so the Church and its pastor, Jorge Orozco, brought this suit for
20
    declaratory judgment and permanent injunction, alleging violations of the Religious Land
21
    Use and Institutionalized Persons Act of 2000 (RLUIPA), 42 U.S.C. §§ 2000cc to
22
    2000cc-5, the First and Fourteenth Amendments to the United States Constitution, and the
23
    Arizona Religious Freedom Restoration Act, A.R.S. §§ 41-1493 to 41-1493.02.  The
24
    parties agreed to consolidate the Church's motion for preliminary injunction with trial on
25
    the merits under Fed. R. Civ. P. 65(a)(2) and have stipulated to many of the facts.  This
26
    order states findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52(a).
27

28

**I. Findings of Fact**

　　**A.  The City of Yuma**

　　　The City of Yuma lies in the southwestern corner of the State of Arizona, near the confluence of the Colorado River and the Gila River.  Since the mid-1990s, the City has been redeveloping its historic downtown and riverfront areas.  The City began by producing a document entitled "Historic Downtown Yuma: Imagine a 2020 Vision," which envisioned revitalizing Main Street and the riverfront with activity generating uses and attractions.  Throughout the 1990s, significant public investments were made to increase tourism and visitation in those areas, such as creating the Yuma Crossing State Historic Park, clearing uses that did not generate visitation, and restoring historic sites on Main Street, such as the San Carlos Hotel.

　　　In 2000, the United States Congress created the Yuma Crossing National Heritage Area ("YCNHA"), a twenty-two square mile area along the Colorado River that includes the City's riverfront, historic downtown, and surrounding historic neighborhoods.  The express purpose of the YCNHA is to promote development of those areas.  The YCNHA is a private non-profit corporation whose executive director is paid by the City.  Working from the City's 2020 Vision, and in consultation with the local community, the YCNHA Management Plan ("the management plan") was created and approved locally and by the Secretary of the Interior of the United States in July of 2002.  The management plan includes seven districts, including the Downtown Riverfront and Main Street.  The Downtown Riverfront area will include a new Arizona Welcome Center, which is financed with $4 million in state investment.  It also includes Gateway Park, which was financed with $4.4 million in public investment, and a $30 million dollar hotel conference center.

　　　The City's Main Street terminates near Gateway Park.  The management plan seeks to integrate the Main Street area with Gateway Park by attracting "private investment in new residential housing, office development, entertainment, and in-fill development."  (Trial Ex. 28 at 12.)  To this end, the City assisted in the creation of Main

1    Street Cinemas with a $250,000 loan, invested $6 million in the renovation of the Art

2    Center and Theater, and sold land at a discounted price to promote a mixed-use

3    commercial and residential development called "Shopkeepers."  Additionally, Main Street

4    had been closed to vehicular traffic for many years.  Closure of the street enabled the City

5    to hold large festivals in the area but decreased visitation to adjacent businesses.  The

6    management plan proposed to reopen Main Street as a "convertible street," accessible to

7    vehicular traffic at most times, but able to be closed for festivals and other large events.

8    That proposal came to fruition in early 2007, just before the Church submitted its CUP

9    application, when Main Street was reopened with $3.8 million in public investment.  Such

10   public and private investments, along with the planning documentation, demonstrate that

11   the City has a bona fide, unique, and long-term redevelopment plan for Main Street.

12        Main Street encompasses three city blocks from 1st Street to Giss Parkway in

13   downtown Yuma.  It is part of the Old Town District, which is defined by Yuma City

14   Code § 154-185.  As explained in the code:

15           The Old Town (OT) District is intended to be a retail, business, and
         government center with a special emphasis on tourism and historic
16        preservation, due to the unique qualities present in the Old Town (OT) District
         that set it apart from all other districts in the city.  In this district, commercial
17        establishments are intended to serve the residents of the city, as well as visitors
         to the area.  The priority of this district is to establish and support a mixture of
18        commercial, cultural, governmental, and residential uses that will help to
         ensure a lively pedestrian-oriented district.
19

20   The code permits a variety of uses as a matter of right within the Old Town District,

21   including "Membership organizations (except religious organizations (SIC 86))."  Yuma

22   City Code § 154-187.  The abbreviation "SIC" refers to the Standard Industrial

23   Classification Manual, a publication of the United States Office of Management and

24   Budget that is used to classify establishments for statistical purposes.  The code also

25   permits certain uses upon the granting of a CUP, including drive-through facilities,

26   gasoline service stations, educational services, job training and vocational rehabilitation

27   services, religious organizations, outdoor sales, and utility installations.  Yuma City Code

28   § 154-188.  Religious organizations are allowed as a matter of right in Transitional

1    Districts, Limited Commercial Districts, General Commercial Districts, and Planned

2    Shopping Center Districts, which comprise 3.7 square miles of the City.

3         Within the Old Town District, but not on Main Street, are a Masonic Temple, a

4    Fraternal Order of Eagles, and a Christian Science Church and Reading Room.  The

5    Masonic Temple and the Eagles' existence in downtown predated the creation of the Old

6    Town District.  Some of the uses currently on Main Street are Main Street Cinemas, the

7    Yuma Art Center and Historic Yuma Theatre, Golden Roadrunners Dance Hall,

8    Americana Personalized Fitness Center, Dawn's Dance School, and the Yuma

9    Community Theater Company.  The City has not approved a CUP for any church,

10   educational service, or job training or vocational rehabilitation service to locate on or near

11   Main Street.

12        **B. The Church's Search for Property to Purchase**

13        Pastor Jorge Orozco directed Martin Lara, the Church's administrator, to locate a

14   property for the Church for the first time in 1999.  However, because the Church did not

15   have sufficient funds, Mr. Lara did not actually start identifying potential properties until

16   2003.  Mr. Lara identified two potential buildings in September of 2003 and March of

17   2004.  He attended pre-development meetings for both buildings with the City's

18   Department of Community Development.  Neither building was in downtown Yuma.

19   Although one of the buildings was 6,000 square feet in area, Mr. Lara and Pastor Orozco

20   ultimately decided not to buy either building because they were too small and the

21   necessary improvements were too burdensome.

22        Sometime in 2004 the Church began leasing its current location, which is half of a

23   19,000 square-foot former movie theater at 3142 Arizona Avenue in Yuma.  The building

24   is not located in downtown Yuma.  Another church occupies the other half of the

25   building.  Because the other church began renting its half of the building first, it imposes

26   some restrictions on the time and manner of the Church's use of its half of the building.

27   The Church believes that its half of the building is too small and lacks the installations

28   necessary to carry out activities essential to its faith, such as corporate worship, public

1   baptism, religious instruction classes including Sunday school and Bible study, and
2   general education instruction.  In addition, the owner of the building will not allow the
3   Church to modify it to suit its needs.  The owner has put the property up for sale and the
4   Church is able to rent it only on a month-to-month basis.

5           Faced with these circumstances, the Church decided to continue its search for a
6   property to purchase.  In 2005, the Church made a down payment on land outside of the
7   City limits and made plans to build a 6,000 square-foot church with a seating capacity for
8   250 to 300 people.  At that time, the Church believed that a building of that size would
9   adequately meet its present needs.  (Trial Tr. at 135.)  However, the Church did not
10  ultimately complete that transaction because the builder raised the price above what the
11  Church was able to pay.  Much later, in January 2007, Mr. Lara identified a 4,500 square-
12  foot property at 2879 S. Ave. 4E and attended a pre-development meeting with the City.
13  Again, the property was not located in downtown Yuma.  The City informed the Church
14  that it would need to obtain a special permit from a nearby military installation because
15  the building fell within a sound contour.  The parking area also required improvements.
16  The Church decided not to purchase the property.

17          The Church next contacted a realtor, John Abarca, to help them locate a suitable
18  property.  Mr. Lara spoke with Mr. Abarca about the type of property the Church desired.
19  Specifically, he requested Mr. Abarca to locate a facility that could eventually
20  accommodate a 400-person congregation.  The Church currently has 250 members, of
21  which 200 regularly attend its services.  To accommodate future growth and special
22  events, including holiday services, the Church wished to find a larger facility.  Mr.
23  Abarca used the 2003 International Building Code to calculate that the new facility would
24  need a minimum of 2,800 to 3,000 square feet for the seating area, plus additional space
25  for ancillary uses.  Mr. Abarca used his personal experience at his own church to decide
26  that a 10,000 to 12,000 square-foot building would be ideal.  He used the City's
27  regulations to determine that the Church would need 100 parking spaces.
28          Mr. Abarca conducted a countywide search for properties that had a large open

1  area that could be used as a sanctuary.  Although there are over 9,000 acres of

2  undeveloped land within the City, he did not search for undeveloped land upon which the

3  Church could build a new building.  He also did not conduct an exhaustive search for

4  buildings that would meet the needs of the Church's current congregation.  (Trial Tr. at

5  63.)  A 200-member congregation would need only 50 parking spaces and a minimum of

6  1,400 to 1,500 square feet for seating, plus additional space for ancillary uses.

7        Mr. Abarca identified nine properties for sale that might fit the Church's needs.

8  The properties he found ranged in size from 4,000 to 17,000 square feet.  However, Mr.

9  Abarca did not present all nine of those options to Mr. Lara.  Mr. Lara had told Mr.

10  Abarca that the Church's total budget, including remodeling, was approximately $1

11  million.  Some of the properties that Mr. Abarca found were outside of the Church's

12  budget.  For example, one of the nine properties that Mr. Abarca identified is the

13  Church's currently rented location at 3142 Arizona Avenue.  However, the cost of that

14  property was $2.4 million and the Church would have had to make additional

15  renovations, so Mr. Abarca did not present it as an option to Mr. Lara.

16        Additionally, Mr. Lara had asked Mr. Abarca to concentrate on properties on Main

17  Street in downtown Yuma because the City's parking requirements do not apply to

18  buildings there.  Although the Church believes that ministering to the downtown area is

19  part of its religious mission, from 1999 until 2007 it had never looked for property in

20  downtown or on Main Street.  The reason that the Church began looking at properties on

21  Main Street was because it had learned that the City's usual parking requirements do not

22  apply there.  (Trial Tr. at 54, 107).  There was no particular religious reason that the

23  Church needed to locate in the downtown area.  Ultimately, Mr. Abarca presented only

24  three buildings to Mr. Lara.  All three were on or adjacent to Main Street.  (Trial Tr. at 55,

25  108.)  One of the properties that Mr. Abarca did not present to Mr. Lara was located at

26  660 E. 18th Place.  It is a 12,000 square-foot building that has plenty of classroom space,

27  a 3,000 square-foot area that could be used as a sanctuary, and 40 to 50 parking spaces.

28  That property would have met the needs of the Church's current congregation, but was

1   not big enough to accommodate future growth to a 400-person congregation.  (Trial Tr. at

2   36, 56–57, 61–62.)

3         Of the three properties that Mr. Abarca did present, Mr. Lara rejected two because

4   they were too expensive.  The remaining property is located at 354 S. Main St.  It is a

5   17,466 square-foot building that used to be a J.C. Penny department store from 1952 to

6   1976.  From 1977 to 1993, the building was used by garment manufacturers as a

7   warehouse and factory.  Since 1993, it has been vacant except for limited use for

8   temporary storefront displays and as a temporary facility for California Bakery in 1998.

9   The City declined to support the Yuma Reading Council, United Way, Parents

10  Anonymous, and Big Brothers Big Sisters when those organizations offered to purchase

11  and renovate 354 S. Main St. for use in their community work.  (Trial Ex. 3 at 58.)  The

12  Church believes that the building has sufficient space for it to carry out the activities

13  essential to its faith and practices.

14        **C.  The Church's Purchase of the 354 S. Main St.**

15        The Church contracted to purchase 354 S. Main St. on February 13, 2007.  The

16  property was in foreclosure and available at a bargain price, so the Church felt pressure to

17  move on the deal quickly.  Only after contracting to purchase the property, on February

18  20, 2007, did the Church attend a pre-development meeting with the City.  Due to their

19  concern about the rushed timetable of the purchase, the Church was particularly careful at

20  the meeting to ask whether there were any potential problems with operating a church at

21  the property.  City staff informed the Church that a conditional use permit was required

22  for religious assemblies to operate in the Old Town District, of which Main Street is a

23  part.  The Church understood at that time that the power to grant or deny a CUP lies

24  exclusively with the City Planning and Zoning Commission ("the Commission") and the

25  Yuma City Council.  They also understood that they would have to attend a hearing

26  before the Commission.  City staff informed the Church that a neighborhood meeting for

27  public comments had to take place before the hearing.  It is common practice for a

28  prospective buyer of real property either to obtain a necessary CUP before closing the

1   purchase or to provide in the contract that obtaining such a CUP is a condition of the

2   buyer's obligation to close the purchase.  Because the property was in foreclosure and the

3   owner was not willing to wait any longer, on March 5, 2007, the Church consciously

4   chose to close on the purchase before applying for the necessary CUP .  (Trial Tr. at

5   65–72, 127; Trial Ex. 4 at 15–16.)

6         **D. The CUP Application**

7         Shortly after Main Street was reopened as a convertible street, on March 30, 2007,

8   the Church submitted its CUP application.  In the application, the Church represented that

9   it is a 200-member congregation with services or activities on a daily basis.  The proposed

10  activities included church services, music and dance lessons, counseling, summer Bible

11  camps, GED classes, English classes, and computer classes.  The majority of the activities

12  the Church proposed were to take place after 4:00 p.m.  The Church also stated its desire

13  to participate in community events on Main Street.

14        The neighborhood meeting was held on May 30, 2007.  Many neighbors expressed

15  concerns about the Church, including that the Church would detract from the retail focus

16  of Main Street and would not have to pay taxes for the upkeep of public areas, such as

17  parking areas, along Main Street, and that the State of Arizona would prohibit future

18  liquor licenses for properties within 300 feet of the Church.  In response, the Church

19  offered to make a payment in lieu of taxes for upkeep of the common areas on Main

20  Street and offered to run a coffee shop out of the front of its building.

21        The City's Community Planning staff prepared a Staff Report for the Commission

22  recommending denial of the CUP.  As grounds for the recommendation, the report stated

23  that the Church's proposed use "does not implement the purpose statement (Section 154-

24  185) of the Zoning Ordinance . . . nor does it conform to the Historic Yuma Downtown

25  Plan 2020 (which is the basis for the entire Riverfront and Heritage Area Redevelopment

26  effort) . . . and is in conflict with the City's long-term goal of Main Street as a cultural,

27  retail, recreation, and entertainment hub for the north end of the City."

28

1    The staff observed that granting the CUP would have some positive effect,

2    including "the possibility of investment and rehabilitation of a deteriorated and long-

3    vacant building in the Old Town District, more people coming to the downtown area

4    during off-hours, [and] the aesthetic improvement to Main Street resulting from the

5    restoration of the building."  However, according to the staff, granting the CUP for the

6    Church would have been inconsistent with prior City Council actions, which had sought

7    to redevelop and revitalize Main Street with a complementary mix of retail, restaurant,

8    and entertainment uses.  The staff referred to the YCNHA Management Plan, which

9    established the goal of "revitalization of the Downtown and Riverfront into a 24/7

10   downtown neighborhood involving retail, residential, office and entertainment . . . to

11   feature Downtown and the Riverfront as a tourist destination."  The report included a list

12   of the many public investments that had been made in the Main Street and riverfront areas

13   to that end.

14       The staff found the CUP application particularly problematic because the Church

15   desired to locate on Main Street.  The report noted the following differences between the

16   Old Town District in general and Main Street in specific:

17           The Old Town District encompasses more than Main Street.  There
             are presently churches in the Old Town District, but they are not on the
18           commercial strip of Main Street.

19           There are unique aspects of Main Street not seen elsewhere in the
             Old Town District.  These aspects include: no on-site parking required of
20           any business; historic commercial uses and buildings between 1st Street and
             Giss Parkway; a concentration of entertainment venues; significant financial
21           investment by the City of Yuma in the streets and revitalization of
             buildings; a pedestrian friendly environment; and numerous street fair
22           events throughout the year.

23   The staff would not have looked with the same disfavor on an application for the Church

24   to locate elsewhere in the Old Town District.

25       Additionally, the staff members observed that allowing the Church to locate on

26   Main Street would limit additional liquor licensing along the street.  The staff referenced

27   A.R.S. § 4-207, which restricts most liquor licensing within 300 feet of schools and

28   churches.  Granting the Church the CUP would have foreclosed new liquor licenses for

1   bars, breweries, wine bars, clubs, liquor stores, and all other retail purveyors of alcohol,

2   other than restaurants and hotels, for slightly more than one-third of Main Street's total

3   area (one block out of three blocks).  The staff members were concerned that granting the

4   CUP could harm property values in that area and would lead to the loss of a retail and

5   entertainment direction for Main Street.  The report therefore concluded that granting the

6   CUP would be "detrimental, or injurious, to the value of property in the vicinity, or the

7   general welfare of the city" and recommended denial of the CUP.  Alternatively, if the

8   Commission voted to grant the CUP, the staff recommended that they accept the Church's

9   offer to pay a fee in lieu of taxes for maintenance of common facilities on Main Street.

10      The hearing before the Commission took place on July 9, 2007.  The staff

11  elaborated on the points outlined above and representatives of the Church spoke in favor

12  of granting the CUP.  After all public comments had been taken, the commissioners

13  unanimously voted to deny the CUP application.  One of the commissioners commented

14  that he is a member of a church that has had problems with property purchases in the past,

15  but he nevertheless voted to deny the CUP.  On December 5, 2007, the Yuma City

16  Council declined to revisit the Commission's decision.

17  **II. RLUIPA**

18      The Church argues that the City's denial of the CUP violates two subsections of

19  RLUIPA: (1) the substantial burden provision of 42 U.S.C. § 2000cc(a), and (2) the equal

20  terms provision of § 2000cc(b)(1).

21      **A. Substantial Burden Provision**

22      RLUIPA provides:

23          No government shall impose or implement a land use
            regulation in a manner that imposes a substantial burden on
24          the religious exercise of a person, including a religious
            assembly or institution, unless the government demonstrates
25          that imposition of the burden on that person, assembly, or
            institution-
26
            (A)   is in furtherance of a compelling interest; and
27
            (B)   is the least restrictive means of furthering that
28                compelling governmental interest.

§ 2000cc(a)(1).  RLUIPA does not define the term "substantial burden," but the Supreme Court's free exercise jurisprudence "demonstrate[s] that a 'substantial burden' must place more than an inconvenience on religious exercise." *Guru Nanak Sikh Soc'y v. County of Sutter*, 456 F.3d 978, 988 (9th Cir. 2006) (quoting *Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1227 (11th Cir. 2004)).  "[F]or a land use regulation to impose a 'substantial burden,' it must be 'oppressive' to a 'significantly great' extent.  That is, a 'substantial burden' on 'religious exercise' must impose a significantly great restriction or onus upon such exercise." *Id.* at 988–89 (quoting *San Jose Christian Coll. v. City of Morgan Hill*, 360 F.3d 1024, 1034 (9th Cir. 2004)).[1]

By denying the Church's CUP application, the City prevented the Church from using its newly acquired Main Street property for religious practices.  Our circuit confronted a similar situation in *Guru Nanak Sikh Society v. County of Sutter.*  The religious organization in that case sought a new location for a Sikh temple and was twice denied a CUP by the county.  The court explicitly declined to hold that "failing to provide a religious institution with a land use entitlement for a new facility for worship *necessarily* constitutes a substantial burden pursuant to RLUIPA." *Id.* at 989 (emphasis added).  Instead, it found that "the history behind Guru Nanak's two CUP application processes, and the reasons given for ultimately denying these applications, to a significantly great extent lessened the possibility that future CUP applications would be

---

[1]  Our circuit recently decided *Navajo Nation v. United States Forest Service*, 535 F.3d 1058 (9th Cir. 2008) (en banc).  There, the court held that "[u]nder RFRA [the Religious Freedom Restoration Act, 42 U.S.C. §§ 2000bb to 2000bb-4], a 'substantial burden' is imposed only when individuals are forced to choose between following the tenets of their religion and receiving a governmental benefit (Sherbert) or coerced to act contrary to their religious beliefs by the threat of civil or criminal sanctions (Yoder)." *Id.* at 1069–70.  The City argues that this definition should also apply under RLUIPA because, like RFRA, it merely adopted the meaning of substantial burden used by the Supreme Court.  The substantial burden analysis in *Guru Nanak* is consistent with *Navajo Nation*, and *Guru Nanak* is on point because it addresses a land use restriction on a religious organization under RLUIPA, rather than RFRA.

1   successful." *Id.* Specifically, the county's broad and inconsistent reasons for denying

2   Guru Nanak's two separate CUP applications showed that it would likely deny further

3   applications for almost any location. *Id.* at 989–92. It therefore held that the county

4   imposed a substantial burden on the religious organization "[b]ecause the County's

5   actions have to a significantly great extent lessened the prospect of Guru Nanak being

6   able to construct a temple in the future." *Id.* at 992.

7         Additionally, the court noted that "the availability of other suitable property

8   weighs against a finding of a substantial burden." *Id.* at 992 n.20 (citing *San Jose*

9   *Christian Coll.*, 360 F.3d at 1035). As the Court of Appeals for the Second Circuit put it:

10  "when an institution has a ready alternative — be it an entirely different plan to meet the

11  same needs or the opportunity to try again in line with a zoning board's recommendations

12  — its religious exercise has not been substantially burdened. The plaintiff has the burden

13  of persuasion with respect to both factors." *Westchester Day Sch. v. Vill. of Mamaroneck*,

14  504 F.3d 338, 352 (2d Cir. 2007) (citing 42 U.S.C. § 2000cc-2). However, this does not

15  mean that to prove a substantial burden under RLUIPA a religious group needs to "show

16  that there was no other parcel of land on which it could build its church." *Guru Nanak*,

17  456 F.3d at 989 (quoting *Saints Constantine & Helen Greek Orthodox Church, Inc. v.*

18  *City of New Berlin*, 396 F.3d 895, 899–900 (7th Cir. 2005)). In *Guru Nanak*, alternative

19  sites were technically available, but the county's decision-making was demonstrably

20  arbitrary, since it denied the two CUP applications using broad and contradictory reasons.

21  The court held that "RLUIPA does not contemplate that local governments can use broad

22  and discretionary land use rationales as leverage to select the precise parcel of land where

23  a religious group can worship." *Id.* at 992 n.20 (citing *Saint Constantine*, 396 F.3d at

24  900); *see also Westchester*, 504 F.3d at 350–51 ("[A] substantial burden claim [may be

25  successful] where land use restrictions are imposed on the religious institution arbitrarily,

26  capriciously, or unlawfully."); *Grace Church v. City of San Diego*, 555 F. Supp. 2d 1126,

27  1136 (S.D. Cal. 2008) ("At various levels of Defendants' mandatory CUP process, Grace

28

1   Church experienced outright hostility to its application [and] decision-making that is

2   seemingly arbitrary or pretextual . . . .").

3          Accordingly, to demonstrate that the City significantly lessened the prospect of the

4   Church locating a suitable property, the Church could show that the breadth or

5   arbitrariness of the City's reasoning indicates that it will likely deny a CUP for almost

6   any location.  It could also show a severe shortage of acceptable alternative properties.

7   The Church has not met its burden in either respect.

8          The City denied the Church's CUP application primarily because it was

9   inconsistent with the City's past efforts and future plan to develop Main Street into a

10  tourism, entertainment, and retail corridor.[2]  The City predicted that the Church would

11  impede further redevelopment of Main Street in accordance with the plan, in part because

12  one full block of Main Street would become subject to restrictions on liquor licensing.

13  Those reasons for denying the CUP do not significantly lessen the prospect of the Church

14  being able to locate a suitable property in which to worship.  They are peculiar to Main

15  Street and could not "easily apply to all future locations proposed" by the Church.  *Guru*

16  *Nanak*, 456 F.3d at 989.  The Staff Report notes that "[t]here are unique aspects of Main

17  Street not seen elsewhere in the Old Town District."  With planning materials and public

18  and private investments made throughout more than a decade, the City has demonstrated

19  a bona fide, unique, and long-term redevelopment plan for Main Street.  Nothing suggests

20  that the City would have denied the Church a CUP to locate elsewhere in the Old Town

21  District, or for that matter, elsewhere in the City of Yuma.  The City's reasoning does not

22  effectively "shrink the large amount of land theoretically available . . . to several scattered

23  parcels that the [City] may or may not ultimately approve."  *Id.* at 992.  It eliminates only

24  the possibility of locating on Main Street.

25  _____

26         [2]Contrary to the Church's assertion, the City did not rely on the tax-exempt status of
    the Church to deny the CUP.  Rather, it recommended that if the City council voted to
27  approve the CUP it should accept the Church's offer to pay a maintenance fee in lieu of
    taxes.
28

1    The Church also has not shown that suitable properties do not exist outside of

2    Main Street.  The Church provides no reason why it cannot fulfill its calling to minister to

3    downtown Yuma from a property elsewhere in the City.  The Church has repeatedly and

4    seriously considered building or buying property outside of the downtown area.  Such

5    actions show that it can fulfill its religious mission from property outside of the

6    downtown area.  Indeed, from 1999 until early 2007, the Church did not consider even a

7    single property anywhere in the downtown area.  It only began looking at properties in

8    downtown after it learned that the City's usual parking requirements do not apply to

9    properties on Main Street.  There is no reason to question the Church's professed belief

10    that it must minister to the downtown area.  But to be clear, as a matter of fact, there is no

11    particular religious reason that the Church must locate along Main Street in general or

12    specifically at 354 W. Main St.  It can fulfill its mission from property located elsewhere.

13    The Church believes that it needs 354 W. Main St. because its current location is

14    inadequate.  But just because the Church needs a new facility does not mean that the

15    facility must be 354 W. Main St.  The Church bought that property before submitting its

16    CUP application and knew that its application might be denied.  *See Petra Presbyterian*

17    *Church v. Vill. of Northbrook*, 489 F.3d 846, 851 (7th Cir. 2007) ("Having decided to go

18    ahead and purchase the property outright after it knew that the permit would be denied,

19    Petra assumed the risk of having to sell the property and find an alternative site for its

20    church should the denial be upheld . . . .").  Relying on *Cottonwood Christian Center v.*

21    *Cypress Redevelopment Agency*, 218 F. Supp. 2d 1203 (C.D. Cal. 2002), and *Eslinore*

22    *Christian Center v. City of Lake Elsinore*, 291 F. Supp. 2d 1083 (C.D. Cal. 2003), the

23    Church argues that denial of a CUP imposes a substantial burden any time a religious

24    organization has purchased a new facility to replace its current, inadequate facility.  Such

25    a rule would provide a growing religious organization with a de facto exemption from the

26    zoning laws, allowing it to locate anywhere it pleases so long as it has purchased an

27    adequate facility.  That was not Congress's purpose in enacting RLUIPA.  146 Cong.

28    Rec. S7774, S7776 (2000) (Joint Statement of Senator Hatch and Senator Kennedy)

1    ("This Act does not provide religious institutions with immunity from land use regulation,

2    nor does it relieve religious institutions from applying for variances, special permits or

3    exceptions, hardship approval, or other relief . . . ."). A religious organization must show

4    more than inadequacy of its current facility and adequacy of the proposed facility to

5    override an otherwise valid land use regulation as a substantial burden. It must show a

6    severe shortage of acceptable alternative properties. *Guru Nanak*, 456 F.3d at 989, 992;

7    *Episcopal Student Found. v. City of Ann Arbor*, 341 F. Supp. 2d 691, 707 (E.D. Mich.

8    2004) (distinguishing *Cottonwood* because the church in that case had "experienced

9    massive growth over a 20-year period, and had extensively explored and exhausted its

10   options before filing suit").

11        Ample property that would meet the Church's needs exists within the City. The

12   Church's realtor, Mr. Abarca, identified the Church's current rented location as a

13   potential property to purchase. Although the size of that property is adequate, the Church

14   did not consider it an option because it is too expensive and requires too many

15   improvements. But the cost of acceptable property is just one of the "ordinary difficulties

16   associated with location (by any person or entity, religious or nonreligious) in a large

17   city" and does not amount to a substantial burden. *Civil Liberties for Urban Believers v.*

18   *City of Chicago*, 342 F.3d 752, 761 (7th Cir. 2003) (citing *Love Church v. City of*

19   *Evanston*, 896 F.2d 1082, 1086 (7th Cir. 1990)), *accord San Jose Christian Coll.*, 360

20   F.3d at 1035; *Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1227 n.11 (11th

21   Cir. 2004) ("That the congregations may be unable to find suitable alternative space does

22   not create a substantial burden within the meaning of RLUIPA . . . [because] '[t]he harsh

23   reality of the marketplace sometimes dictates that certain facilities are not available to

24   those who desire them.").

25        Mr. Abarca also identified a property at 660 E. 18th Place that would meet the

26   needs of the Church's current congregation. The Church did not consider that option

27   because it preferred a building that could accommodate a 400-person congregation. Yet,

28   as the Church's own previous behavior shows, the desire for a larger facility does not

justify excluding options that would meet the ordinary needs of the Church's current congregation.  In 2005, it had made plans to build a facility that would have been adequate only for its current congregation.  If the builder had not raised his price, the Church would have built that facility and it would have been much smaller than 660 E. 18th Place.  In fact, all of the buildings that the Church seriously considered from 2003 to early 2007 were much smaller than 660 E. 18th Place.  Nevertheless, Mr. Abarca did not conduct an exhaustive search for buildings large enough only for the Church's current congregation.  Nor did he conduct an exhaustive search for undeveloped land within the City upon which the Church could build, even though there are over 9,000 acres of such land within the City.

The Church falls far short of showing a severe lack of available alternative properties, and the City's reason for denying the CUP does not indicate that it will also deny future applications to locate in areas other than Main Street.  The City therefore did not significantly lessen the prospect of the Church locating a suitable property, and denial of the CUP is not a substantial burden.

**B.  Equal Terms Provision**

In a separate subsection entitled "Discrimination and exclusion," RLUIPA provides:

> (1)  Equal terms.  No government shall impose or implement a land use regulation in a manner that treats a religious assembly or institution on less than equal terms with a nonreligious assembly or institution.
>
> (2)  Nondiscrimination. No government shall impose or implement a land use regulation that discriminates against any assembly or institution on the basis of religion or religious denomination.

42 U.S.C. § 2000cc(b)(1)–(2).

Three general types of equal terms violations have been identified:

> (1) a statute that facially differentiates between religious and nonreligious assemblies or institutions; (2) a facially neutral statute that is nevertheless "gerrymandered" to place a burden solely on religious, as opposed to nonreligious, assemblies or institutions; or (3) a truly neutral statute that is selectively enforced against religious, as opposed to nonreligious assemblies or institutions.

1    *Primera Iglesia Bautista Hispana of Boca Raton, Inc. v. Broward County*, 450 F.3d 1295,

2    1308 (11th Cir. 2006).  The Church's primary allegation in this case is that the City's

3    zoning code facially violates the equal terms provision.  Alternatively, it argues that the

4    City's actual denial of the CUP violates the provision.

5            The federal courts of appeals that have interpreted RLUIPA's equal terms

6    provision agree on certain general principles.  The mere fact that the City's zoning code

7    identifies religious organizations as a distinct type of use does not impair its facial

8    neutrality.  *Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1232 (11th Cir.

9    2004) ("Merely the mention of a church or synagogue in a zoning code does not destroy a

10   zoning code's neutrality . . . ."); *cf. Church of the Lukumi Babalu Aye, Inc. v. City of

11   Hialeah*, 508 U.S. 520, 533 (1993) ("A law lacks facial neutrality if it refers to a religious

12   practice without a secular meaning discernable from the language or context.").  This is

13   because there can be legitimate reasons for a zoning code to identify religious

14   organizations as a distinct type of land use.  *See, e.g.*, *Vision Church v. Village of Long

15   Grove*, 468 F.3d 975, 999 (7th Cir. 2006) ("The Plan Commission was concerned about

16   the size of the church complex and its effect on the character of the Village, concerns

17   separate and independent from the religious affiliation (or lack thereof) of the institution .

18   . . .").  The reason that Yuma City Code § 154-187 distinguishes between "religious

19   organizations" and "membership organizations" is because under the SIC religious

20   organizations are a subset of the broader category of membership organizations.  The

21   code's recognition of that distinction does not by itself suggest that it treats religious and

22   nonreligious assemblies and institutions on less than equal terms.

23           There is also wide agreement that the equal terms provision codifies the Supreme

24   Court's Free Exercise Clause jurisprudence regarding neutral laws of general

25   applicability.  *Lighthouse Inst. for Evangelism, Inc. v. City of Long Branch*, 510 F.3d 253,

26   264 (3d Cir. 2007) ("It is undisputed that, when drafting the Equal Terms provision,

27   Congress intended to codify the existing jurisprudence interpreting the *Free Exercise

28   Clause*." (citing 146 Cong. Rec. S7774 (July 27, 2007) (Senate Sponsors' statement));

1   *Midrash*, 366 F.3d at 1232 ("RLUIPA's equal terms provision codifies the *Smith-Lukumi*

2   line of precedent.").  In *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508

3   U.S. at 546, the Supreme Court declared that a "law burdening religious practice that is

4   not neutral or not of general application must undergo the most rigorous of scrutiny."  A

5   law is not neutral "if the object of [the] law is to infringe upon or restrict practices

6   because of their religious motivation," *id.* at 533, and is not generally applicable if it "in a

7   selective manner impose[s] burdens only on conduct motivated by religious belief," *id.* at

8   543.  *See also San Jose Christian Coll.*, 360 F.3d at 1031 (quoting *Lukumi*, 508 U.S. at

9   533, 543)).  Congress "codif[ied] those standards for greater visibility and easier

10  enforceability" in RLUIPA's equal terms and nondiscrimination provisions.  146 Cong.

11  Rec. at S7775.

12          Beyond these general principles, there is some conflict among the federal courts of

13  appeals.  The core of the conflict is whether a religious organization can prove a violation

14  of RLUIPA's equal terms provision merely by showing that some nonreligious

15  assemblies or institutions are afforded better treatment within a given jurisdiction.

16  According to the reading of the provision advanced by the Church in this case, "if a

17  zoning regulation allows *a* secular assembly, *all* religious assemblies must be permitted."

18  *Lighthouse*, 510 F.3d at 268 (criticizing the interpretation given in *Midrash*, 366 F.3d at

19  1231) (emphasis added).  Such an interpretation has been criticized as leading to the

20  absurd result that "if a town allows a local, ten-member book club to meet in the senior

21  center, it must also permit a large church with a thousand members."  *Id.*  An alternative

22  interpretation of the provision, advanced by the City in this case, draws on Free Exercise

23  Clause jurisprudence to conclude that a religious assembly or institution must show that it

24  is treated less well than "secular assemblies or institutions that are similarly situated *as to*

25  *the regulatory purpose*."  *Id.* at 266.  Our circuit has not yet clarified the test to be

26  applied.

27          The statute requires comparison of "*a* religious association or institution" with "*a*

28  nonreligious association or institution."  42 U.S.C. § 2000cc(b)(1) (emphasis added).

1    Furthermore, unlike the substantial burden provision, the language of the equal terms
2    provision does not explicitly provide for any evaluation of the strength of the
3    governmental interests behind the law or the connection between the government's
4    objectives and the means used to achieve those objectives.  In the abstract, it could
5    therefore mean that a law that treats even a single nonreligious assembly or institution
6    better than any religious assembly or institution is subject to strict liability.  Yet the
7    language of the provision is not so plain as to compel that interpretation.  A better way to
8    provide for such a test would have been to prohibit laws that treat "*any* religious assembly
9    or institution on less than equal terms than *any* nonreligious assembly or institution."
10   While the indefinite article "a" can also bear that meaning, it does not necessarily compel
11   it without support from the context and purpose of RLUIPA.  As explained below, such
12   support is lacking.

13        Even if one thought so much force was packed into the provision's use of the
14   shortest word in our language, that supposedly plain meaning would not necessarily
15   prevail upon further inquiry.  *See County of Santa Cruz v. Cervantes* (*In re Cervantes*),
16   219 F.3d 955, 960–61 (9th Cir. 2000) ("[W]e ignore plain language only when a 'literal
17   interpretation would thwart the purpose of the over-all statutory scheme or lead to an
18   absurd result.'").  The extremity of the above described interpretation is self-evident.  A
19   zoning law that excluded all but a single assembly or institution would fail such a test,
20   despite treating religious assemblies and institutions on equal terms with the
21   overwhelming majority of secular assemblies and institutions.  Even though the law
22   would provide equal treatment to all assemblies and institutions that share the same land
23   use impacts, and no matter how peculiar or necessary the characteristics of that one
24   permitted secular use, all types of religious assemblies and institutions would have to be
25   permitted as well.  Such a result asks too much of the provision's simple language.
26   "RLUIPA's Equal Terms provision requires equal treatment, not special treatment."

27

28

1    *Primera Iglesia*, 450 F.3d at 1313.[3]

2         Congress included more in RLUIPA than the equal terms provision.  It also

3    included a provision that defines the burden of persuasion in such cases.

4         If a plaintiff produces prima facie evidence to support a claim alleging a
     violation of the Free Exercise Clause or a violation of section 2 [42 U.S.C.
5    § 2000cc], the government shall bear the burden of persuasion on any element
     of the claim . . . .
6

7    42 U.S.C. § 2000cc-2(b).  This provision applies to the land use provisions of the statute.

8    As it makes clear, Congress intended to simplify a religious assembly or institution's

9    burden to prove a prima facie case of a Free Exercise Clause violation.  This is because it

10   was confronting discrimination against religious uses that was "often covert" and it

11   wanted to "codify" existing free exercise standards "for greater visibility and easier

12   enforceability."  146 Cong. Rec. at S7775.  Therefore, through the equal terms provision,

13   it required a religious assembly or institution to identify a nonreligious assembly or

14   institution that is treated better.  *See Midrash*, 366 F.3d at 1230 ("[T]he relevant 'natural

15   perimeter' for consideration with respect to RLUIPA's prohibition is the category of

16   'assemblies and institutions.'"); *Vision*, 468 F.3d at 1003 ("[T]he pertinent question is

17   whether the 'land use regulation. .. treats a religious assembly or institution on less than

18   equal terms with a nonreligious assembly or institution.'").

19   _____

20        [3]  Our circuit has upheld the constitutionality of RLUIPA's substantial burden
     provision as applied to individualized land use determinations, such as the arbitrary denial
21   of a CUP.  *See Guru Nanak*, 456 F.3d at 992–95.  It must be noted, however, that the
     sweeping interpretation of the equal terms provision described above might run afoul of the
22   Establishment Clause of the First Amendment and could exceed Congress's powers under
     Section Five of the Fourteenth Amendment.  It would far exceed religious organizations'
23   rights under the Free Exercise Clause to exempt them, on the basis of their religious
     motivation, from land use restrictions faced by all secular organizations with similar or
24   identical land use impacts.  Presumably, Congress intended the equal terms provision not
     pose serious constitutional problems.  *See Edward J. DeBartolo Corp. v. Fla. Gulf Coast
25   Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988) ("[W]here an otherwise
     acceptable construction of a statute would raise serious constitutional problems, the Court
26   will construe the statute to avoid such problems unless such construction is plainly contrary
27   to the intent of Congress.").

28

1    However, it is beyond dispute that Congress only codified free exercise principles

2  in the equal terms provision; it did not change or exceed them.  *Lighthouse*, 510 F.3d at

3  264; *Midrash*, 366 F.3d at 1232.  That Congress equated the equal terms provision with

4  the free exercise principles of neutrality and general applicability is apparent from

5  RLUIPA's legislative history.  "Each subsection [of the land use provisions] closely

6  tracks the legal standards in one or more Supreme Court opinions . . . ."  146 Cong. Rec.

7  at S7775.  Specifically, the equal terms and nondiscrimination provisions "enforce the

8  Free Exercise Clause rule against laws that burden religion and are not neutral and

9  generally applicable."  *Id.* at S7776.

10    That Congress codified but did not exceed free exercise principles is also apparent

11  from the language and structure of RLUIPA's burden shifting provision.  *See Primera*

12  *Iglesia*, 450 F.3d at 1308 ("Under the statute, a plaintiff bears the initial burden of

13  'produc[ing] prima facie evidence to support a claim alleging a[n Equal Terms]

14  violation." (alterations in original)).  Congress treated "a violation of the Free Exercise

15  Clause" exactly the same as a violation of the equal terms provision of the statute, shifting

16  the "burden of persuasion on any element of the claim" to the government.  42 U.S.C. §

17  2000cc-2(b).  The same is not true of RLUIPA's substantial burden provision, which

18  departs from free exercise jurisprudence by imposing strict scrutiny on a law that

19  substantially burdens a person's free exercise of religion. § 2000cc(a)(1).  Consequently,

20  under the burden shifting provision, Congress was careful to note that the burden to show

21  a substantial burden remains with the plaintiff at all times. § 2000cc-2(b).

22    Once a religious assembly or institution has provided prima facie evidence of an

23  equal terms violation, the statute places the burden on the government to show why a Free

24  Exercise Clause violation has not occurred.  A neutral and generally applicable law does

25  not ordinarily violate the Free Exercise Clause.  *Lukumi*, 508 U.S. at 531.  Accordingly,

26  the government may satisfy its burden of persuasion by showing that any disparate

27  treatment of a religious and a nonreligious assembly or institution stems from a neutral

28  and generally applicable principle.

1      The two federal courts of appeals with the most divergent views on the proper

2  interpretation of RLUIPA both agree with this principle.  In *Midrash Shephardi, Inc. v.*

3  *Town of Surfside*, the Court of Appeals for the Eleventh Circuit explained that any

4  violation of RLUIPA's equal terms provision must also necessarily violate the principles

5  of neutrality and general applicability.  366 F.3d at 1232–35 ("As demonstrated above, a

6  violation of *§(b)*'s equal treatment provision indicates that the offending law also violates

7  the *Smith* rule requiring neutrality and general applicability.).  In *Lighthouse Institute for*

8  *Evangelism, Inc. v. City of Long Branch*, the Court of Appeals for the Third Circuit relied

9  on the principles of neutrality and general applicability explained in *Lukumi* to formulate

10  its "similarly situated as to the regulatory purpose" test.  510 F.3d at 265–66.  Therefore,

11  although the outcomes of *Midrash* and *Lighthouse* were different, the courts agreed that

12  ultimately, "[b]y requiring equal treatment of secular and religious assemblies, RLUIPA

13  allows courts to determine whether a particular system of classifications adopted by a city

14  subtly or covertly departs from requirements of neutrality and general applicability."

15  *Midrash*, 366 F.3d at 1232.

16      If a city permits a few nonreligious assemblies or institutions in a given district,

17  that does not necessarily mean that it must permit all religious assemblies or institutions

18  under RLUIPA.  In such a hypothetical case, numerous other secular assemblies and

19  institutions would be excluded from the district in addition to religious organizations.

20  The government might be able to prove that some neutral and generally applicable

21  principle causes the disadvantage, not religion.  Read in the greater context of RLUIPA,

22  the principal effect of the equal terms provision is to enable a religious organization to

23  easily shift to the zoning authority the burden of proving that the regulation is neutral and

24  generally applicable.  This serves Congress's purpose of rooting out covert discrimination

25  without overreaching existing Free Exercise Clause principles by exempting religious

26  uses from zoning regulation.  A zoning ordinance does not violate the equal terms

27  provision, even if it permits some secular assemblies or institutions and excludes religious

28  assemblies or institutions, so long as there is a neutral and generally applicable principle

1   for doing so.

2   **1.  The Church's Prima Facie Evidence of an Equal Terms Violation**

3   The Church must provide prima facie evidence that the City's zoning code is not

4   neutral and generally applicable because it treats a religious assembly or institution on

5   less than equal terms than a nonreligious assembly or institution.  The code permits

6   secular membership organizations to locate in the Old Town District as a matter of right,

7   but requires religious organizations, educational services, and job training and vocational

8   rehabilitation services to obtain a CUP.  Yuma City Code § 154-187 to 154-188.  All of

9   the uses mentioned above include organizations that fall within the plain meaning of the

10  terms "assemblies and institutions."

> An "assembly" is "a company of persons collected together in one place [usually] and usually for some common purpose (as deliberation and legislation, worship, or social entertainment);" or "[a] group of persons organized and united for some common purpose." An institution is "an established society or corporation: an establishment or foundation esp. of a public character;" or "an established organization, esp. one of a public character . . . ."

15  *Midrash*, 366 F.3d at 1230–31 (citations omitted) (alterations in original).  That the

16  zoning code permits secular membership organizations within the Old Town District as a

17  matter of right but requires a CUP from religious organizations is prima facie evidence of

18  a facial equal terms violation.  Additionally, the facts show that the City has actually

19  allowed some secular assemblies and institutions to locate within the Old Town District

20  but has denied a CUP to the Church.  That is prima facie evidence that the City applies

21  the ordinance in a way that violates the equal terms provision.

22  **2.  Facial Validity of the CUP Requirement**

23  As explained above, the City's zoning code requires a CUP not only from religious

24  organizations, but also from educational services and job training and vocational

25  rehabilitation services.  It therefore places burdens on some secular assemblies and

26  institutions equal to the burdens placed on religious assemblies and institutions, but treats

27  other secular assemblies and institutions better than religious organizations.  The City

28

1  bears the burden to show that a neutral and generally applicable principle lies behind this

2  distribution of burdens.

3          It argues that a CUP is required for religious organizations because the Old Town

4  District is "intended to be a retail, business, and government center with a special

5  emphasis on tourism and historic preservation, . . . [and where] commercial

6  establishments are intended to serve the residents of the city, as well as visitors to the

7  area."  Yuma City Code § 154-185.  The City relied upon the SIC to classify uses for the

8  Old Town District.  The SIC lists other kinds of uses that religious organizations often

9  maintain, such as educational institutions, hospitals, publishing houses, reading rooms,

10 social services, second hand stores, and radio and television stations.  Religious

11 organizations frequently use a single facility for purposes of assembly and for various

12 accessary uses.  *See* 146 Cong. Rec. at S7776 ("[N]ot every activity carried out by a

13 religious entity or individual constitutes 'religious exercise.'  In many cases, real property

14 is used by religious institutions for purposes that are comparable to those carried out by

15 other institutions."); Brian W. Blaesser & Alan C. Weinstein, *Federal Land Use Law &*

16 *Litigation* § 7:36 at 694 (2008) ("Uses that have been held to be accessory to churches

17 cover an enormous variety of activities . . . ."); Sara C. Galvan, Note, *Beyond Worship:*

18 *The Religious Land Use and Institutionalized Persons Act of 2000 and Religious*

19 *Institutions' Auxiliary Uses*, 24 Yale L. & Pol'y Rev. 207 (2006) (discussing the

20 proliferation of auxiliary uses run by religious institutions).  In such circumstances, the

21 City may need to regulate the accessary use to avoid conflicts with surrounding uses.  It

22 therefore decided that to accomplish the overall plan for the Old Town District religious

23 organizations should undergo particularized review.

24         The Church's CUP application bears out the City's point.  It includes the Church's

25 intent to offer GED, English classes, and computer classes, which could be job training

26 services that would trigger the zoning code's CUP requirement if pursued independently.

27 However, since the Church undertakes such activities as part of its religious mission, and

28 its primary use of the facility is assembly, the City might have to allow those accessory

1    uses if it permitted the Church in the Old Town District as a matter of right.  *See, e.g.*,

2    *Jirtle v. Bd. of Adjustment*, 175 N.C. App 178, 622 S.E.2d 713 (2005) (holding that a

3    church did not need a special permit to operate a food pantry because it constituted an

4    accessory use).  Requiring a CUP from religious organizations enables the City to assess

5    and mitigate the impact that such kinds of accessary uses might have on surrounding uses,

6    irrespective of their religious motivation.  *See Family Life Church v. City of Elgin*, 561 F.

7    Supp. 2d 978, 985–988 (N.D. Ill. 2008) (holding that under the Free Exercise Clause and

8    RLUIPA a City could apply a CUP requirement to a church that sought to operate a

9    homeless shelter as an accessory use).  If religious organizations were allowed to locate in

10   the Old Town District as a matter of right, some would pose conflicts with surrounding

11   entertainment and retail uses, and the district would lose its planned direction.

12         Moreover, within the Old Town District, the City has engaged in a decade-long

13   effort to revitalize and redevelop Main Street into a tourist, entertainment, and retail

14   center for the City.  It has invested millions of dollars to that end.  Allowing religious

15   organizations to locate on Main Street as a matter of right would derail that plan.  The

16   State of Arizona restricts the issuance of liquor licenses within 300 feet of religious

17   organizations.  A.R.S. § 4-207.  If there were to be just one religious organization on each

18   of Main Street's three blocks, the entire street would be off limits to new bars, breweries,

19   wine bars, clubs, liquor stores, and most other retail purveyors of alcohol.  Yet the City

20   plans for Main Street to be a tourist destination and entertainment area that includes those

21   uses.  The CUP requirement ensures that the mix of uses able to locate on Main Street is

22   not altered in a manner inconsistent with the City's plan.

23         The Church relies on *Digrugilliers v. Consolidated City of Indianapolis*, 506 F.3d

24   612, 615 (7th Cir. 2007), to argue that the City "cannot, by granting churches special

25   privileges (the right of a church official to reside in a building in a nonresidential district,

26   or the right of the church to be free from offensive land uses in its vicinity), furnish the

27   premise for excluding churches from otherwise suitable districts."  In other words, the

28   City may not gerrymander the zoning ordinance by using facially neutral terms to achieve

the exclusion of religious organizations.  But quite separately from the City, the SIC and

the foregoing sources confirm the practical reality that many religious organizations

customarily engage in wide-ranging accessary uses.  Furthermore, many years before the

City created the Old Town District, it was the state that decided to benefit churches and

schools by restricting liquor licensing within their vicinity.  *See First Baptist Church v.*

*Ariz. State Liquor Bd.*, 149 Ariz. 20, 716 P.2d 81 (Ct. App. 1986) (holding the original

statute an unconstitutional establishment of religion because it gave churches a veto

power over the issuance of liquor licenses).  When the City created the Old Town

District, it was working within these legitimate constraints, not inventing them to mask

discrimination.  *See Lighthouse*, 510 F.3d at 271 n.15 (declining to follow *Digrugilliers*).

Perhaps more importantly, unlike *Digrugilliers*, the City has not sought to exclude

religious organizations altogether.  Rather, through the CUP requirement, it seeks to

include them in the Old Town District in a manner consistent with its plan.

There is no indication that the City has gerrymandered the ordinance to exclude

religious organizations.  "Zoning laws inherently distinguish between uses and

necessarily involve selection and categorization, often restricting religious assemblies to

designated districts and frequently requiring that religious assembles complete a

conditional use application procedure."  *Midrash*, 366 F.3d at 1234.  "[I]nequality results

when a legislature decides that the governmental interests it seeks to advance are worthy

of being pursued only against conduct with a religious motivation."  *Id.* (quoting *Lukumi*,

508 U.S. at 542–43).  The zoning code does not assert its plan for the Old Town District

only, or even primarily, against uses motivated by religious belief.  It also requires a CUP

from educational services and job training and vocational rehabilitation services.  Those

are types of assemblies or institutions that, if permitted as a matter of right, could derail

the plan for the district in much the same way as religious organizations.  *See Ass'n of*

*Zone A & B Homeowners Subsidiary, Inc. v. Zoning Bd. of Appeals*, 298 A.D.2d 583, 749

N.Y.S.2d 68 (App. Div. 2d Dep't 2002) ("Educational institutions are generally permitted

to engage in activities and locate on their property facilities for such social, recreational,

athletic, and other accessory uses as are reasonably associated with their educational purpose."). Notably, schools trigger the same restrictions on liquor licensing as do churches, A.R.S. § 4-207, and so they also must obtain a CUP to locate in the Old Town District.

Although the zoning law permits other kinds of membership organizations in the Old Town District as a matter of right, the City has shown that it considers secular reasons for assembling no more valuable than religious reasons. Secular membership organizations do not trigger restrictions on alcohol licensing. Furthermore, nonreligious "membership organizations" under the SIC, such as business associations, labor unions, and political organizations, do not customarily engage in wide-ranging accessory uses. Therefore, if a particular business association, for example, did engage in some activity exceeding the definition of "business association," that activity could easily be classified under a different category of the SIC and not be permitted as a matter of right. The City need not worry that by permitting such organizations it is opening the door to secondary land use impacts, so there is no reason to require a CUP.

The City was not targeting religious organizations because of their religious motivations, and it did not pursue its interests only against religious organizations. Rather, it was guided by the neutral desire to redevelop the Old Town District in general, and Main Street in particular as a tourism, entertainment, and retail area. Uses that posed particularly acute and obvious threats to that goal if left unregulated, irrespective of their secular or religious motivation, were allowed only on condition of obtaining a CUP. The zoning code does not violate RLUIPA on its face.

### 3. Application of the CUP Requirement to the Church

The Church has also identified nonreligious assemblies and institutions actually located on Main Street, so the City bears the burden of persuasion that its denial of the CUP to the Church is consistent with the Free Exercise Clause. The actual conditions on Main Street and the City's consideration of the CUP application show that the City was guided by neutral and generally applicable principles. The secular assemblies and

institutions that exist on Main Street include a movie theater, an art center and theater, a dance hall and studio, and a fitness center. All of those uses fit the City's goal of creating a tourism, entertainment, and retail corridor. The City has not approved CUP applications from other churches, educational services, or job training services to locate on or near Main Street. In fact, the City declined to support the Yuma Reading Council, United Way, Parents Anonymous, and Big Brothers Big Sisters when those organizations offered to purchase and renovate the very same property, 354 S. Main St., for use in their community work. The City does allow a Christian Science Church to operate in the Old Town District, but that organization is not located on or near Main Street. The two secular membership organizations most analogous to the Church located in the Old Town District are the Fraternal Order of Eagles and The Masonic Temple. Neither of those uses is on Main Street, and in any event, both predate the creation of the Old Town District.

Judging from the Staff Report and the transcript of the hearing before the Commission, there can be no doubt that the dispositive factor in the denial of the CUP was the negative effect that allowing a church on Main Street would have on the long-term redevelopment plan. Although the Staff Report noted that the Church's tax-exempt status would allow it to avoid paying the maintenance tax for common facilities along Main Street, such as parking, that was not cited as a basis for denying the CUP. Rather, the staff recommended that if the Commission granted the CUP, they should accept the Church's offer to pay a fee in lieu of taxes for that purpose. The restrictions on liquor licensing were a pivotal concern for the staff. The inability to site complementary entertainment uses on one-third of a major tourism, entertainment, and retail center for the City and the potential harm to adjacent property values outweighed the positive impacts brought by the Church. The decision to deny the CUP therefore had nothing to do with the Church's religious motivation, but rather concentrated on its land use impacts and the consequences to the redevelopment plan.

1

### 4.  Rational Basis Review

2          Since the equal terms provision codifies free exercise principles, rational basis

3   review must be applied where the government shows that the unequal treatment identified

4   by a religious organization actually stems from a neutral and generally applicable

5   principle.  *See Midrash*, 366 F.3d at 1235 (concluding that strict scrutiny applies to laws

6   that violate the equal terms provision).  Under rational basis review, the regulations will

7   be upheld if they are rationally related to a legitimate governmental purpose.  *Campanelli*

8   *v. Allstate Life Ins. Co.*, 322 F.3d 1086, 1100 (9th Cir. 2003).   "[T]he burden is on the

9   one attacking the legislative arrangement to negative every conceivable basis which

10  might support it."  *Silveira v. Lockyer*, 312 F.3d 1052, 1089 (9th Cir. 2002) (quoting

11  *Heller v. Doe*, 509 U.S. 312, 320 (1993)).  Although it is a court's duty to scrutinize the

12  connection between the government's objective and the means that it has used to

13  accomplish that objective, "courts are compelled under rational-basis review to accept a

14  legislature's generalizations even when there is an imperfect fit between means and

15  ends."  *Philips v. Perry*, 106 F.3d 1420, 1425 (9th Cir. 1997) (quoting *Heller*, 509 U.S. at

16  321)).

17         The zoning code's CUP requirement for religious organizations and the City's

18  denial of a CUP to the Church bear a rational relationship to the City's redevelopment

19  goals for Main Street.  The Church argues that it would mesh with the City's goal for

20  Main Street because it has an active congregation that wishes to be involved in the

21  downtown community.  It would not have been appropriate for the City to consider the

22  lively character of the Church's congregation or its willingness to participate in the

23  commercial and community activities on Main Street.  Such considerations risk

24  discriminating between religious uses.  Denying a CUP to a church of a less

25  accommodating character on that basis would most certainly run afoul of the Free

26  Exercise Clause.  *See Lighthouse*, 510 F.3d at 271 n.16 ("To allow Lighthouse an

27  exemption because of the 'upbeat' nature of its services and their frequency, as well as

28

1   [its] willingness to engage in commercial activities, is to risk discriminating *between*

2   religious uses . . . .").

3        There is no doubt that allowing religious organizations to locate on Main Street

4   would affect the mix of other uses able to operate there and could consequently

5   compromise the City's plans and investments.  Granting the CUP to the Church would

6   have prevented most new liquor licensing for one-third of Main Street's total area.  The

7   Church points out that numerous other permitted uses in the Old Town District are not

8   tourism, entertainment, or retail oriented, but it has not shown that those other uses

9   similarly threaten to alter the types of uses that can locate on Main Street.  It also argues

10  that state law would not prevent restaurants, hotels, and special events from serving liquor

11  even if the Church was allowed to locate on Main Street.  It is enough, however, that the

12  Church would have prevented all other types of liquor licensing, altering the mix of uses

13  on a significant portion of Main Street in a manner inconsistent with the City's plan.

14  "Although there may be room for disagreement over [the City's] prioritizing the

15  availability of alcohol consumption over the ability to seek spiritual enlightenment,"

16  *Lighthouse*, 510 F.3d at 272, the City's actions bear a rational relationship to its

17  objectives for Main Street.

18  **III.  Other Constitutional and Statutory Claims**

19       The Church asserts that the City's zoning code and its denial of the CUP violates

20  several provisions of the Constitution of the United States.  The foregoing analysis shows

21  why each of those claims fail.  Beginning with the Free Exercise Clause of the First

22  Amendment, it already has been explained that the zoning code's CUP requirement is

23  neutral and generally applicable.  Therefore, even assuming that it burdens the Church's

24  free exercise of religion, it does not violate the Free Exercise Clause.  *See Vision*, 468

25  F.3d at 996–97 (collapsing claims under RLUIPA and the Free Exercise Clause).

26       Similarly, the City has not violated the Arizona Religious Freedom Restoration

27  Act, A.R.S. § 41-1493.01.  The language of the Arizona statute is slightly different than

28  RLUIPA, but it still requires that the challenged law impose a "substantial burden" on the

1   free exercise of religion.  The briefing on the subject has been minimal, but no party has

2   argued that the meaning of substantial burden under the Arizona statute is any different

3   than under RLUIPA.  The City has not violated the Arizona statute because, as explained

4   previously, it has not imposed a substantial burden on the Church's free exercise.

5          Since the CUP requirement is neutral and generally applicable, it does not

6   discriminate against the Church or religious organizations "on the basis of religion."

7   *Vision*, 468 F.3d at 1001.  Therefore, when analyzed under the Equal Protection Clause of

8   the Fourteenth Amendment, "no suspect class or fundamental right is involved," and

9   "[w]e therefore apply only rational basis scrutiny to [the religious organization's] equal

10   protection claims."  *Id.* at 1000–01 (citing *Locke v. Davey*, 540 U.S. 712, 720 n.3 (2004)).

11   The City's zoning code and its denial of the CUP to the Church both survive rational

12   basis review for reasons already explained.

13          Neither the zoning code nor denial of the CUP violates the Church's First

14   Amendment free speech rights.  The analysis above has shown that the CUP requirement

15   furthers the neutral, generally applicable, and substantial interests of the City.  It therefore

16   is not a "pretext for suppressing expression."  *San Jose Christian Coll.*, 360 F.3d at 1033

17   (quoting *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 48, 54 (1986)).  Nor does

18   it "'ban' speech, but merely designate[s] where such speech may occur."  *Id.* at 1032.

19   Since there is ample property not subject to a CUP requirement within the City, the

20   zoning code does not "unreasonably limit alternative avenues of communication," and it

21   is a valid "content-neutral 'time, place and manner' restriction."  *Id.* at 1032–33.

22          The City's denial of the CUP does not violate the Church's First Amendment right

23   to free association.  The City has effectively denied the Church the ability to assemble at

24   its property at 354 S. Main St. or at any other location on Main Street.  "But the fact that

25   the church's congregants cannot assemble at that precise location does not equate to a

26   denial of assembly altogether."  *Id*. at 1033 (citing *Christian Gospel Church, Inc. v. City

27   & County of S.F.*, 896 F.2d 1221, 1224 (9th Cir. 1990)).  Accordingly, there has been no

28   violation of the Church's right to free association.

1     IT IS THEREFORE ORDERED that the motion for preliminary injunction

2  (doc. # 3) is denied.

3     IT IS FURTHER ORDERED that the Clerk enter judgment against Plaintiffs and

4  in favor of Defendants and that Plaintiffs take nothing.  The Clerk shall terminate this

5  action.

6     Dated: January 30, 2009.

7

8  _____

                    Neil V. Wake

9             United States District Judge

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28